UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS – CENTRAL DIVISION

|  |  |  |
|---|---|---|
| JOSEPH M. LOSAPIO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO.: |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, | ) | **04-40156** |
| Defendant. | ) | |
| | ) | |

**DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO CONSOLIDATE
PURSUANT TO F.R.C.P. 42 AND L.R. 40.1(j)**

Defendant, METROPOLITAN LIFE INSURANCE COMPANY (hereinafter

referred to as "MetLife") hereby moves this Court pursuant to Federal Rule of Civil

Procedure 42 and Local Rule 40.1(j) to consolidate this action with the matter of Joseph

M. Losapio v. The Lincoln National Life Insurance Company, Docket No.: 0469CV0193,

which is pending in the East Brookfield District Court, County of Worcester,

Massachusetts.

**FACTS**

On October 22, 1985, the Lincoln National Life Insurance Company ("Lincoln

National") issued a policy for disability benefits (Policy Number: 15 6026745, hereinafter

referred to as "the Policy") to Plaintiff Joseph Losapio (hereinafter "Plaintiff" or "Mr.

Losapio"). Plaintiff's Complaint, Paragraph 3, attached hereto as Exhibit "A." Plaintiff

later made a claim for benefits with Lincoln National and, for a period of time, Lincoln

National paid residual disability benefits to Mr. Losapio. Id. at Paragraphs 6, 9. In 1999,

administration of the Policy was transferred to MetLife. Id. at Paragraph 10. MetLife

later determined that Mr. Losapio was no longer disabled under the terms and provisions
of the Policy and, therefore, discontinued benefit payments.

On or about June 24, 2004, Mr. Losapio filed a Complaint against Lincoln
National in the District Court Department, East Brookfield Division, Worcester County
Massachusetts, Civil Action No. 0469CV0193 (hereinafter "the Lincoln National
Complaint.") A copy of Plaintiff's <u>Complaint</u> against Lincoln National is attached hereto
as Exhibit "B." This Complaint sought to recover residual disability payments that Mr.
Losapio claimed were owed him between August 1, 2003 and January 31, 2004. <u>Id.</u> at
Paragraph 8. The exhibits to the Complaint identified the policy at issue to be Policy
Number 1506026745. <u>Id.</u>

Less than a month later, on or about July 14, 2004, Mr. Losapio filed a *second*
Complaint in the District Court Department, East Brookfield Division, Worcester County
Massachusetts, Civil Action No. 0469CV0226. This Complaint (hereinafter referred to
as "the MetLife Complaint") was brought against MetLife <u>as administrator</u> of Policy
Number 1506026745, the same policy identified in the Lincoln National Complaint.
Exhibit "A." In this second Complaint, Mr. Losapio claimed that MetLife committed
various unfair and deceptive acts in its administration of the Policy, based on the same
facts giving rise to the suit against Lincoln National. However, it was MetLife's denial
of benefits that was at the core of Plaintiff's Complaint: like the Lincoln National
Complaint, the MetLife Complaint sought to recover residual disability benefit payments
under the Policy for the period of August 2003 until January 2004[1]. <u>Id.</u> at Paragraph 18.

---

[1] It should be noted that, as of the filing of this motion, Mr. Losapio has never indicated to MetLife that his
disability has ended, and he has submitted medical opinions stating that his alleged disability is chronic and
degenerative in nature, making the potential value of his claims much greater than what he has initially
alleged.

## ARGUMENT

Consolidation under F.R.C.P. 42 is proper when "actions involving a common question of law or fact are pending before the court." The decision to consolidate cases is one generally left to the discretion of the trial judge. New England Energy, Inc. v. Keystone Shipping Co., 855 F.2d 1, 7 (1st Cir. 1988).

> 'The threshold issue' in determining whether to consolidate two cases "is whether the two proceedings involve a common party and issues of fact or law. . . . Once this determination is made, the trial court has broad discretion in weighing the costs and benefits of consolidation to decide whether that procedure is appropriate. . . . Absent demonstrable prejudice, consolidation is generally allowed.

[Citations omitted.] Bay State HMO Management, Inc. v. Tingley Systems, Inc., et al., 152 F.Supp.2d 95, 102 (D. Mass. 1995); New England Energy, at 7; See, e.g., Sutcliffe Storage & Warehouse Co. v. U.S., 162 F.2d 849, 851 (1st Cir.1947).

In the instant dispute, Plaintiff Losapio brought two suits in which the only damages he identified were residual disability benefit payments he alleged were owed from Policy Number 1506026745 during the period between August 2003 and January 2004. Although the MetLife Complaint includes allegations of "unfair and deceptive" actions by MetLife, allegations that Plaintiff did not level at Lincoln National, an adjudication of Plaintiff's rights under the Policy terms is at the heart of both cases. Further, both cases involve common issues of law and, while the actions are not identical and do not completely overlap factually and legally, they contain the "requisite commonality" for consolidation purposes. Bay State HMO, at 102.

Further, it is appropriate to consider and weigh the convenience to the parties and judicial economy against the possibility of confusion, delay or prejudice that might result

3

from consolidation.  <u>Data General Corporation v. Grumman Systems Support</u>

<u>Corporation</u>, 834 F.Supp. 477, 487 (D.Mass. 1992), affm'd, 36 F.3d 1147 (1st Cir. 1994).

As administrator for the Policy, MetLife will defend Plaintiff's suits for benefits during

the time period in question, whether the Plaintiff names Lincoln National or MetLife as

Defendant.  By filing separate suits, Plaintiff seeks to double MetLife's litigation costs

and to double the resources that must be devoted to the defense of his claims.  Further,

the maintenance of two separate suits will eventually require two trials and will require

two Courts to rule on the same issues of law and fact.

Significantly, no good reasons exist to waste judicial resources on two separate

lawsuits that involve the exact same policy and facts.

Finally, Plaintiff will suffer no demonstrable prejudice from the consolidations of

these matters.  Though consolidation may take from him a "second bite of the apple," a

second chance to prove he is owed benefits, this prejudice is illusory.  A final judgment

in one case would preclude re-litigating individual facts, and possibly Plaintiff's entire

claim, because of the doctrines of collateral estoppel and *Res Judicata*.

***WHEREFORE***, MetLife respectfully requests that this matter be consolidated

with <u>Joseph M. Losapio v. The Lincoln National Life Insurance Company</u>, Docket No.:

0469CV0193 pending in the East Brookfield District Court, County of Worcester

Massachusetts.

## LOCAL RULE 7.1 CERTIFICATE OF CONSULTATION

I hereby certify that on August 5, 2004, we conferred with opposing counsel in an attempt to narrow the issues presented by the underlying Motion.



James J. Ciapciak

Defendant,

METROPOLITAN LIFE INSURANCE COMPANY,

By Its Attorneys,



James J. Ciapciak (BBO # 552328)
Joseph R. Daigle  (BBO # 564203)
CIAPCIAK & ASSOCIATES, P.C.
99 Access Road
Norwood, MA 02062
(781) 255-7401

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served upon Counsel of Record on August **17**, 2004.

James J. Ciapciak



COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

DISTRICT COURT DEPARTMENT
EAST BROOKFIELD DIVISION
CIVIL ACTION
NO. 0469CV0226

JOSEPH M. LOSAPIO      )
    Plaintiff      )
              )
vs.      )
              )
METROPOLITAN LIFE      )
INSURANCE COMPANY      )
    Defendant      )

COMPLAINT

1. Plaintiff Joseph M. Losapio is a resident of Worcester, Worcester County, Massachusetts.

2. Defendant Metropolitan Life Insurance Company (hereinafter referred to as "MetLife") is a corporation with a usual place of business at 4100 Boy Scout Boulevard, Tampa, Florida 33607, and is licensed to do business in the Commonwealth of Massachusetts.

3. By a policy of insurance issued by Lincoln National Life Insurance Company (hereinafter referred to as "Lincoln Life") to the plaintiff, dated October 22, 1985, Lincoln Life undertook and agreed to pay initial monthly benefits of up to two thousand ($2,000.00) dollars to the plaintiff in the event the plaintiff became partially disabled.

4. On August 17, 1989 that policy was amended to change the word "Partial" to "Residual" as set forth in the attached letter from Lincoln Life marked as Exhibit "A".

5. On March 23, 1995 plaintiff sustained injuries in a motor vehicle accident which caused a partial disability.

6. Thereafter, the plaintiff, who is an attorney, made a claim with Lincoln Life for residual disability benefits.

7. At the time the plaintiff made his claim, the disability insurance industry was undergoing a crisis because it had miscalculated a number of claims that would be filed when it aggressively marketed disability policies to professionals in the 1980s and early 1990s.

8.  Lincoln Life conducted an extensive investigation of the plaintiff's claim for residual disability benefits from 1995 through June of 1998 and, as a result, determined that the plaintiff had met the policy requirements for payment for residual disability benefits.

9.  Accordingly, Lincoln Life paid, without a Reservation of Rights, residual disability benefits to the plaintiff through November of 1999.

10.  In December of 1999, Lincoln Life transferred the administration of its individual disability insurance claims to the defendant, MetLife.

11.  From December of 1999 through March of 2004, the defendant committed numerous unfair or deceptive acts declared unlawful under Massachusetts General Laws c. 176D and c. 93A in connection with its administration of the plaintiff's residual disability claim, all of which are more fully set forth on pages 5 through 7 in the plaintiff's 93A demand letter to the defendant dated March 24, 2004, a copy of which is attached hereto and marked as Exhibit "B".

12.  The defendant's unfair and deceptive conduct resulted in the defendant's unfairly denying the plaintiff's claim for residual disability benefits for the months of August 2003 through January 2004, at the rate of $2,700.00 per month for a total of $16,200.00.

13.  The defendant denied payment to the plaintiff even though all medical evidence demonstrated that the plaintiff had met the policy requirements for "Residual Disability".

14.  The acts of the defendant were willfully and knowingly done in violation of Massachusetts General Laws c. 176D and c.93A.

15.  On March 24, 2004, the plaintiff sent to the defendant, by certified mail, written demand for relief, a copy of which is attached hereto and marked as Exhibit "B".

16.  The defendant failed to tender a written offer of settlement within thirty (30) days.

17.  Defendant's refusal to grant relief upon demand was made in bad faith and with reason to know that the acts complained of violated Massachusetts General Laws c. 176D and c.93A.

18.  As a result of the defendant's unfair and deceptive acts, the plaintiff has been damaged in the amount of $16,200.00 for the benefits due from August of 2003 through January of 2004, together with any additional benefits due thereafter.

WHEREFORE, plaintiff demands judgment against defendant including triple damages, attorneys fees, interest and costs.

By his attorney,

JOHN F. KEENAN
390 Main Street
Worcester, MA 01608
(508) 791-8181
BBO#264000
Dated:  July 14, 2004

1300 South Clinton Street
P.O. Box 1110
Fort Wayne, Indiana 46801

**LINCOLN NATIONAL**
LIFE INSURANCE
COMPANY

August 17, 1989

LOSAPIO,JOSEPH M
736 PLEASANT ST
WORCESTER,MA 01602

POLICY NUMBER: 1506026745

Dear Valued Policyholder:

Lincoln National recently announced enhancements to its non-cancellable Pro Add Contract. In our continuing effort to keep your contract provisions up-to-date, we are happy to include these enhancements in your existing policy.

At no additional cost, effective upon your state approval (this has been approved in your state) and contingent that you were not disabled on that date, the following improvements will be part of your existing coverage:

1. We will change the wording "Partial" to "Residual" to reflect current terminology.

2. Under the DEFINITIONS section of your policy, the definition of "Residual (Partial) Disability" has been liberalized to read as follows:

   "during the Elimination Period because of Injury or Sickness:
   a) You are not able to do one or more of the main duties of Your Occupation or You can perform all of Your normal duties but not for as much time as is normally required to perform them; and
   b) You are under a Physician's Care; and
   c) Your current Monthly Income is 80% or less of Your Prior Monthly Income.

   Following the Elimination Period, Residual Disability means that due to the continuation of that Injury or Sickness:

   a) Your Current Monthly Income is 80% or less of Your Prior Monthly Income; and
   b) You are under a Physicians's Care."

   As you can see, after the elimination period, only a) and b) will now need to be satisfied.

3. The calculation of "Current Monthly Income" for a Residual (Partial) Disability has been liberalized to include only income earned and received after the commencement of disability. This provision may increase your residual benefit since it will not penalize you for receipt of accounts receivable income from billings prior to disability or for income billed but not yet received.

1300 South Clinton Street
P.O. Box 1110
Fort Wayne, Indiana 46801



**LINCOLN NATIONAL**
LIFE INSURANCE
COMPANY

4.  Under the DEFINITIONS section, the "Maximum Benefit Period" for a Residual (Partial) Disability has been extended past age 65 to a maximum of 24 months for disabilities beginning after age 63 and before age 65.

5.  Policy renewability has been extended from age 75 to lifetime if you are actively and regularly employed on a full time basis. The maximum benefit period for renewal after age 75 is 12 months.

6.  The Recurrent Disability provision has been extended from 6 to 12 months. (Not approved in Arkansas, Iowa, Pennsylvania, South Carolina, Texas, Virginia and New Jersey.)

7.  A Survivor Benefit has been added to your policy. If you die while receiving benefits under your policy and if you were totally disabled for at least 24 months prior to your death, we will pay the monthly benefit for up to three months, but not beyond the remainder of the maximum benefit period.

If your existing coverage includes the Own Occupation Benefit Rider, the Option to Increase Benefit Rider, or the Supplemental 60 Benefit Rider, you also receive the corresponding enhancements below:

1.  The Own Occupation Benefit Rider can be renewed after age 65.

2.  The Option to Increase (O.I.) Rider has numerous enhancements:

    a) The ages at which you can buy this O.I. rider or add to your existing O.I. rider has been extended to age 49.
    b) The maximum amount of O.I. which you can purchase has also been increased.
    c) Under your O.I. rider, you have the right to increase the amount of your Policy Benefit on each option date. Prior to age 46, the amount of increase on any option date can be up to 100% of your Total Amount of Options. After age 46, the amount of increase on any option date can be up to 1/3 of the Total Amount of Options. These amounts of increases reflect our new liberalized amounts.
    d) The termination date of your rider has been extended from "the anniversary of the Date of Issue next following your 50th birthday" to "the anniversary of the Date of Issue next following your 52nd birthday." This means you will have two additional years to exercise your option amounts. The rider will still continue to terminate if you have used up all your option amounts or if your policy has terminated.
    e) You can apply for an increase in your Policy Benefit on any option date even though you are disabled. Up to $600 of this increase will be payable while that period of disability continues. Any increase, including the $600, will be subject to our current issue and participation limits.
    f) When an increase is exercised, the premium for this rider will be reduced. The reduced premium will be based on the Total Amount of Options remaining.

1300 South Clinton Street
P.O. Box 1110
Fort Wayne, Indiana 46801



**LINCOLN**
**NATIONAL**
LIFE INSURANCE
COMPANY

3.  The option to Convert Supplemental 60 Benefit Rider is our newest
    rider and we are excited about it.  This rider allows you, on each
    anniversary of the Date of Issue, to convert your Supplemental 60
    Benefit to an Age 65 Benefit Period, without evidence of insurability.
    This rider is available at a small premium.

We appreciate your business and look forward to serving you.  Be sure to
attach this letter to your policy.  If you would like to add, or increase
any of the riders mentioned above, or if you have any questions, please feel
free to contact your agent.

Sincerely,


Insurance Operations Department
Individual Products Division

# JOSEPH M. LOSAPIO

*Counselor at Law*
736 PLEASANT STREET
WORCESTER, MASSACHUSETTS 01602
(508) 752-4541  FAX (508) 791-0342

Certified Mail No. 7001 0320 0001 4298 2409
RETURN RECEIPT REQUESTED

March 24, 2004

Ms. Bonnie Heath
MetLife Acting as Agent for
The Lincoln National Life Insurance Company
P.O. Box 30429
Tampa, FL 33630-3429

RE:Policy #:   15-6026745

Dear Ms. Heath:

   This is a demand for relief under Massachusetts General Laws c. 93A, §9.  This
demand is being made because of the numerous unfair and deceptive acts declared
unlawful under M.G.L. c. 93A and c. 176D committed by Metropolitan Life Insurance
Company (hereinafter referred to as "MetLife") in connection with the administration of
my Disability Income Insurance Policy with Lincoln National Life Insurance Company
(hereinafter referred to as "Lincoln Life").

## HISTORY OF MY POLICY WITH LINCOLN LIFE

   On September 25, 1985, I applied for a Disability Income Insurance Policy with
Lincoln Life to replace a policy that I had with The Paul Revere Life Insurance Company
(hereinafter referred to as "Paul Revere") since approximately 1979.

   When I applied for this Policy with Lincoln Life, it was represented to me, by Lincoln
Life's agents and advertisements that:

1. Lincoln Life was one of the premier companies in the business
   of providing disability insurance to self-employed professionals;
2. The Policy had the most liberal definitions for disability at that time in the
   industry;
3. Lincoln Life had a reputation for paying its claims and paying them
   fairly; and
4. If I purchased the disability income policy from Lincoln Life, and became
   disabled, it would provide myself and my family with financial security and
   peace of mind.

Exhibit B

When Lincoln Life made these representations, it was well aware that the most important factor in selecting an insurance product from the consumer's point of view is the record of the company in paying its claims and paying them fairly. Sewall, Charles E. (the former President and CEO of The Paul Revere Life Insurance Company) Disability Income Insurance The Unique Risk, 3rd Ed. (1994) Page 81.

Based on these representations by Lincoln Life, I agreed to terminate my existing coverage with Paul Revere Life Insurance Company and purchased the Policy from Lincoln Life. The Policy was issued on October 22, 1985 and was an "Own Occupation Policy" with my occupation listed on the application as an attorney with exact duties being those of a trial attorney. The Policy had a ninety (90) day elimination period. The total monthly benefit was $2,000.00.

On August 17, 1989, Lincoln Life announced enhancements to my Policy. Lincoln Life indicated that:
"the following improvements will be part of your existing coverage:
1. We will change the wording 'Partial' to 'Residual' to reflect current terminology.
2. Under the DEFINITIONS section of your policy, the definition of "Residual (Partial) Disability" has been liberalized to read as follows: 'during the Elimination Period because of Injury or Sickness:
    a) You are not able to do one or more of the main duties of Your Occupation or You can perform all of Your normal duties but not for as much time as is normally required to perform them; and
    b) You are under a Physician's Care; and
    c) Your current Monthly Income is 80% or less of Your Prior Monthly Income.
Following the Elimination Period, Residual Disability means that due to the continuation of that Injury or Sickness:
    a) Your Current Monthly Income is 80% or less of Your Prior Monthly Income; and
    b) You are under a Physician's Care.
As you can see, after the elimination period, only a) and b) will now need to be satisfied."
Attached hereto as Exhibit "A" is letter from Lincoln National Life Insurance Company, dated August 17, 1989.

When Lincoln Life made these enhancements, it was aware that the main competition between companies was on differences in contractual language, especially the definition of disability. Sewall, Charles E. Disability Income Insurance The Unique Risk, 3rd Ed. (1994) Page 81. These enhancements were made, therefore, to induce me not to cancel my Policy and replace it with a policy through other insurers with a more liberal policy definition. Sewall, Charles E. Disability Income Insurance The Unique Risk, 3rd Ed. (1994) Page 81.

Previous to Lincoln Life making these enhancements, I had purchased a policy with The Paul Revere Insurance Company, on April 18, 1989, that had similar language for the definition of residual disability. In addition, I purchased a policy with CNA Insurance Company, on November 1, 1990, that had even more liberal language for the definition of residual disability.

## HISTORY OF MY CLAIM

On March 23, 1995, I was involved in a motor vehicle accident. I was the operator of a vehicle that was stopped to make a left hand turn, when it was rearended by another vehicle. I was initially treated at the Emergency Room at UMass. Hospital and then by Roland R. Caron, M.D., orthopedic surgeon. Dr. Caron's diagnosis was acute cervical and lumbar sprain and several right ankle sprain. An MRI of my right ankle, performed on April 4, 1995, indicated I had sustained a bone bruise to my right ankle. As a result of my injuries, I was unable to perform my normal duties at work and had to reduce my schedule to half day for the period from March 23, 1995 until July 1, 1995. When I returned to work, I experienced continuing pain in my neck that made it difficult to perform my normal duties and was forced to again reduce my work schedule.

On September 22, 1995, Lincoln Life notified me that my disability coverage had lapsed for non payment of premium. This was the only time that I had failed to pay the quarterly premium and this failure was due to the difficulties I was having concentrating because of my neck pain. For the Policy to be reinstated, I had to either demonstrate that I had not received recent medical treatment or that I was disabled at the time my Policy lapsed. Since I had received extensive medical treatment because of my motor vehicle accident, I elected to file a claim for disability benefits.

On October 23, 1995, I filed a claim with Lincoln Life for residual disability benefits, together with the initial Proof of Loss Statement and medical reports from my treating physicians, verifying that I was suffering from chronic neck strain, which prevented me from performing my duties as an attorney in my normal manner. At the same time, I filed claims for residual disability benefits with CNA Insurance Company and Paul Revere. During this time period, the disability insurance industry was undergoing a crisis because it had miscalculated the number of claims that would be filed when it aggressively marketed these policies to professionals in the 1980s and early 1990s. As a result, the industry was now even more aggressively disputing claims made by their policy holders, and Lincoln Life was no exception.

Without making any payment, Lincoln Life continued to request additional information through February of 1996. In addition, Lincoln Life required me to attend on January 25, 1996, an Independent Medical Examination with Dr. Israel Hurwitz, an orthopedic surgeon, with an office in Marlborough, MA. On February 19, 1996, Lincoln Life issued payment to me for residual disability benefits due me through December of 1995.

On May 13, 1996, Lincoln Life informed me that they were unable to consider payment of benefits beyond January 24, 1996, because based on Dr. Hurwitz's examination, "it does not appear that you have limitations or restrictions that may prohibit you from performing the duties of your occupation." Lincoln Life took this position even though the August 17, 1989 enhancements to my Policy had eliminated this requirement and Dr. Hurwitz had stated that I was still suffering from cervical strain. Dr. Hurwitz also indicated that I was a straight-forward, honest individual, and there was no evidence of symptom magnification.

Through the remainder of 1996, I continued to submit medical records from my attending physicians, Roland R. Caron, M.D., an orthopedic surgeon, Stjepan Kereshi, M.D., a neurologist and Reinhard H. Bartelmann, D.C., a chiropractor . All of these records confirmed that I was still suffering from chronic neck strain, which prevented me from working more than an average of six (6) hours per day. In addition, I supplied Lincoln Life with a MRI report from Central Mass. Magnetic Imaging, Inc., dated March 28, 1996, that indicated I had a "small degenerative spur to the left of C3-4 and tiny disc herniation at C5-6."

Despite this medical documentation and the policy language for residual disability that eliminated the need for me to document I was not able to do one or more of my main duties or that I could not perform my normal duties for the time normally required to perform them, Lincoln Life refused to pay me additional benefits.

On April 17, 1997, I sent to Lincoln Life the reports of Vincent R. Giustolisi, M.D., dated December 5, 1996 and Philip J. Lahey, Jr., M.D., dated March 17, 1997, orthopedic surgeons, who examined me on behalf of other insurance companies. Both Dr. Giustolisi and Dr. Lahey verified that I was suffering from a chronic and now permanent neck strain and was permanently partially disabled.

After receiving these reports, Lincoln Life issued payment for benefits due me through March of 1997. In addition, Lincoln Life, by letter of May 27, 1997, notified me that they were issuing payment under a reservation of rights. Lincoln Life detailed numerous issues, both financial and medical, that Lincoln Life wished to address before any further payment was made. Lincoln Life continued to thoroughly investigate my claim through June of 1998, when they finally made payments without any reservation of rights. One of the issues raised by Lincoln Life was whether another Independent Medical Examination was warranted. Lincoln Life concluded that, based on the Policy definition for residual disability benefits and the reports I had submitted, that such an examination was not warranted.        . . . . . . . .

Payments were made routinely by Lincoln Life throughout the remainder of 1998 and 1999. At the same time, however, Lincoln Life was, without my knowing it, in the process of withdrawing from the disability insurance industry.

4

## METLIFE'S UNFAIR AND DECEPTIVE CLAIMS ACTS

On December 17, 1999, I was informed by MetLife that they had assumed responsibility for the administration of my claim for disability income benefits. Beginning on that date and continuing through the present time, MetLife has committed numerous unfair or deceptive claims acts declared unlawful under, M.G.L. c. 93A and 176D, in connection with the administration of my Policy that have deprived me of the financial security and peace of mind promised me by Lincoln Life. In addition, as a result of MetLife's unfair and deceptive acts, I have been damaged in the amount of $16,200.00, the disability benefits due me for the months of August 2003 through January 2004. The unfair and deceptive claims acts committed by MetLife are as follows:

1. MetLife obtained my confidential records from Lincoln Life and reviewed these records without my authorization.

2. In its notice of December 17 1999, MetLife indicated that it was reserving "all its rights and defenses until such time as a complete review of your file can be accomplished." This reservation was issued even though Lincoln Life had been paying my benefits without any such reservation and that MetLife had no grounds for any such reservation. In addition, MetLife gave no explanation for its issuance of this reservation of rights.

3. In the same notice, MetLife requested that I provide them with proof that I applied for Social Security Disability Benefits. This request was made even though Lincoln Life had never made such a request and it was obvious that, based on my medical records and my continuing work history, I was not eligible for Social Security benefits.

4. On July 18, 2000, MetLife unfairly indicated that my benefits under the Supplemental 60 Benefit Rider ended on June 22, 2000, when in fact I was eligible for those benefits for an additional four (4) months.

5. MetLife continued to issue payments to me under a reservation of rights through May 2000, issued payment for the period from June 2000 through September 2000, without a reservation of rights, but again issued benefits under a reservation of rights for the period from October 2000 through August 2001, without any reasonable basis for doing so and without any explanation.

6. Throughout 1999, 2000 and 2001, MetLife unfairly required me to submit financial documentation that I had previously provided to Lincoln Life or had not been required to submit by Lincoln Life to substantiate my claim for residual disability benefits. In October of 2001, MetLife unfairly compelled me to submit to a complete financial audit of my records for the calendar years 1994 through October 2001, even though Lincoln Life had waived any reservation of rights for the period through

5

November 1999. After the audit was completed, MetLife failed to provide me with the results of same. In addition, MetLife failed to properly calculate my Prior Monthly Income and to make the proper adjustments in my Prior Monthly Income as required by the Policy.

7. After paying benefits without any reservation of rights for the period from September 2001 through December 2001, MetLife again issued benefits under a reservation of rights for the benefits due for January 2002 through November 2002, without any reasonable basis for doing so and without explanation, issued payment without a reservation of rights for the month of December 2002, and again reissued a reservation of rights for the payment of January 2003, without any basis for doing so, and without any explanation.

8. In its letter to me of February 14, 2003, MetLife misstated the definition of Residual Disability, by indicating that one of the requirements to be met under a claim for residual disability is that "a) you are not able to do one or more of the main duties of your occupation, or you can perform all of your normal duties but not for as much time as is normally required to perform them." MetLife made this statement despite being aware that this requirement had been eliminated by the August 17, 1989 letter from Lincoln Life. MetLife also unfairly concluded in that letter that "we are unable to document any current impairment and resultant restrictions and limitations." This determination was made despite, my having continually supplied MetLife with Attending Physician's Statements documenting that I still suffered from chronic neck strain, and was still partially disabled and despite MetLife having absolutely no medical evidence whatsoever to dispute this.

9. In a letter of March 14, 2003, MetLife admitted that it had misstated the definition for Residual Disability. Despite this admission, MetLife still unfairly interpreted the Policy language and medical reports and concluded that "we are unable to document any medical impairment to warrant the payment of further benefits." MetLife used this conclusion as a basis for requiring me to attend an Independent Medical Examination. MetLife denied my assertion that it had already determined that it would use the IME as an excuse to terminate my benefits.

10. On April 15, 2003, I was examined, at MetLife's request, by Mark Palumbo, M.D., an orthopedic surgeon, whose office is located in East Greenwich, RI, approximately one mile from MetLife's regional headquarters located in Warwick, RI. Dr. Palumbo issued reports to MetLife, dated April 15, 2003 and May 6, 2003. After making a payment to me for my July benefits without any reservation of rights, MetLife, in a letter dated August 6, 2003, indicated that it had found that there was no further basis for payment of residual disability benefits. MetLife reached its conclusion based on Dr. Palumbo's opinion that I am capable of working an eight (8) hour day. MetLife reached this conclusion despite Dr. Palumbo specifically stating that:

      1. "The present diagnosis of the insured is chronic mechanical neck pain."
      2. "There are subjective findings that support the diagnosis including:

restricted cervical range of motion, mild posterior neck tenderness."

3. "The results of the physical examination are consistent with the insured's claimed restrictions."

4. "There is no evidence of symptoms magnification."

MetLife's denial was an unfair and bad faith interpretation of Dr. Palumbo's report and the definition of residual disability.

11. MetLife also unfairly interpreted the medical reports I had provided. From January 2003 through August 2003, I provided MetLife with the following:

1. MRI report, dated January 29, 2003, showing a straightening of my cervical spine, and additional central disc herniation at C6-7 and additional bone spurring at C6-7;

2. Physical therapy records from Physical Therapy Associates for the period from March 11, 2003 thru April 23, 2003, which documented objective signs of my chronic neck condition and limited functional capacity; and

3. Attending Physician's Reports of Reinhard H. Bartelmann, D.C., dated March 6, 2003, April 14, 2003 and July 2, 2003, which documented my ongoing partial disability.

Any reasonable insurer, acting in good faith, would have interpreted these records, in conjunction with the medical records that I had previously submitted and Dr. Palumbo's report, to conclude there was an insufficient basis to terminate my benefits.

12. Despite my requests to do so, MetLife refused to change its position. MetLife, however, continually encouraged me to submit additional medical information for their consideration. MetLife did so, even though it had no intention of seriously considering additional medical information provided by me. On November 18, 2003, I sent to MetLife the following:

1. EMG Report of Stjepan Kereshi, M.D., dated 9/17/03 which indicated that the neurological findings show mild chronic diffused radiculopathy ; and

2. Consultation report of Dr. Kereshi, dated 9/24/03, that indicated that the patient probably is moderately limited to his activities, and he should avoid any prolonged sitting in one position for a long period of time. His work is limited because of that. He probably should not work more than 6 hours at a time. Dr. Kereshi's report also indicated "there is still some spasm in the back of the neck and evidence of straightening of the cervical spine."

MetLife again unfairly interpreted these reports and the Policy language and still concluded that I am capable of working an eight (8) hour day and therefore no longer disabled according to the terms of the Policy, and unfairly refused to change its position.

As a result of the unfair and deceptive claims acts, I have been damaged in the amount of $16,200.00 for the benefits due me for the months of August 2003 through January 2004. In addition, I have been deprived, since December 1999, of the financial security and peace of mind promised to myself and my family by Lincoln Life when I first purchased this Policy. During this entire time period, MetLife was aware that I had been routinely paid residual disability benefits by Paul Revere, now UnumProvident, and total disability benefits from CNA Insurance Company.

Demand is hereby made for payment to me in the amount of $16,200.00 within thirty (30) days. In addition, demand is hereby made that MetLife cease its unfair interpretation of the Policy language and pay me further benefits without any reservation of rights. MetLife's failure to grant my demand for relief could result in your company being liable, under c. 93A, for up to three times my actual damages, together with attorneys fees.

Lastly, enclosed is copy of report from Roland R. Caron, M.D., dated February 21, 2004, which further documents that I am suffering from:

1. Chronic neck strain;
2. Persistent muscle spasms in the back of my neck;
3. Chronic inflammation of my nerve roots;
4. Further degeneration of his cervical spine; and
5. That I should not work for more than 4 to 6 hours per day.

If MetLife still insists in denying payment of my residual disability benefits, it will be further evidence of the bad faith and unfair interpretation of the Policy language and the medical records.

Very truly yours,

Joseph M. Losapio
JML/jar

enclosure

8



COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                           DISTRICT COURT DEPARTMENT
                                         EAST BROOKFIELD DIVISION
                                         CIVIL ACTION
                                         NO.   0469CV0193


JOSEPH M. LOSAPIO                  )
                                   )
VS.                                )        COMPLAINT
                                   )
THE LINCOLN NATIONAL LIFE          )
INSURANCE COMPANY                  )


1.  Plaintiff is a resident of Worcester, Worcester County, Massachusetts, and was a resident at the time of contracting with the defendant.

2.  Defendant The Lincoln National Life Insurance Company (hereinafter "Lincoln") is a corporation with a usual place of business at 350 Church Street, Hartford, Connecticut.

3.  By a policy of insurance issued by defendant Lincoln to plaintiff dated October 22, 1985, defendant Lincoln undertook and agreed to pay initial monthly benefits of up to two thousand ($2,000.00) dollars to the plaintiff in the event the plaintiff became partially disabled.

4.  On August 17, 1989 that policy was amended to change the word "Partial" to "Residual" as set forth in the attached letter from Lincoln marked "Exhibit A".

5.  On March 23, 1995 plaintiff sustained injuries in a motor vehicle accident which caused a partial disability.

6.  "Residual" disability benefits were paid to the plaintiff until August 2003.

7.  Defendant Lincoln has refused to pay additional monthly benefits although the plaintiff has met the policy requirements of "Residual" disability.

    8.  Defendant Lincoln owes plaintiff the sum of two thousand seven hundred ($2,700.00) dollars per month from August 1, 2003 to January 31, 2004.

    WHEREFORE, plaintiff demands judgment against defendant with interest from the August 1, 2003 date of demand and with costs.

By his attorney,

JOHN F. KEENAN
390 Main Street
Worcester, MA 01608
(508) 791-8181
BBO#264000
Dated:  June 24, 2004

1300 South Clinton Street
P.O. Box 1110
Fort Wayne, Indiana 46801

**LINCOLN
NATIONAL**
LIFE INSURANCE
COMPANY

August 17, 1989

LOSAPIO,JOSEPH M
736 PLEASANT ST
WORCESTER,MA 01602

POLICY NUMBER: 1506026745

Dear Valued Policyholder:

Lincoln National recently announced enhancements to its non-cancellable Pro Add Contract. In our continuing effort to keep your contract provisions up-to-date, we are happy to include these enhancements in your existing policy.

At no additional cost, effective upon your state approval (this has been approved in your state) and contingent that you were not disabled on that date, the following improvements will be part of your existing coverage:

1.  We will change the wording "Partial" to "Residual" to reflect current terminology.

2.  Under the DEFINITIONS section of your policy, the definition of "Residual (Partial) Disability" has been liberalized to read as follows:

    "during the Elimination Period because of Injury or Sickness:
    a) You are not able to do one or more of the main duties of Your Occupation or You can perform all of Your normal duties but not for as much time as is normally required to perform them; and
    b) You are under a Physician's Care; and
    c) Your current Monthly Income is 80% or less of Your Prior Monthly Income.

    Following the Elimination Period, Residual Disability means that due to the continuation of that Injury or Sickness:

    a) Your Current Monthly Income is 80% or less of Your Prior Monthly Income; and
    b) You are under a Physicians's Care."

    As you can see, after the elimination period, only a) and b) will now need to be satisfied.

3.  The calculation of "Current Monthly Income" for a Residual (Partial) Disability has been liberalized to include only income earned and received after the commencement of disability. This provision may increase your residual benefit since it will not penalize you for receipt of accounts receivable income from billings prior to disability or for income billed but not yet received.

Exhibit A

1300 South Clinton Street
P.O. Box 1110
Fort Wayne, Indiana 46801



LIFE INSURANCE
COMPANY

4.  Under the DEFINITIONS section, the "Maximum Benefit Period" for a
    Residual (Partial) Disability has been extended past age 65 to a maximum
    of 24 months for disabilities beginning after age 63 and before age
    65.

5.  Policy renewability has been extended from age 75 to lifetime if you
    are actively and regularly employed on a full time basis. The maximum
    benefit period for renewal after age 75 is 12 months.

6.  The Recurrent Disability provision has been extended from 6 to 12
    months. (Not approved in Arkansas, Iowa, Pennsylvania,
    South Carolina, Texas, Virginia and New Jersey.)

7.  A Survivor Benefit has been added to your policy. If you die while
    receiving benefits under your policy and if you were totally disabled
    for at least 24 months prior to your death, we will pay the monthly
    benefit for up to three months, but not beyond the remainder of the
    maximum benefit period.

If your existing coverage includes the Own Occupation Benefit Rider, the
Option to Increase Benefit Rider, or the Supplemental 60 Benefit Rider, you
also receive the corresponding enhancements below:

1.  The Own Occupation Benefit Rider can be renewed after age 65.

2.  The Option to Increase (O.I.) Rider has numerous enhancements:

    a) The ages at which you can buy this O.I. rider or add to your
       existing O.I. rider has been extended to age 49.
    b) The maximum amount of O.I. which you can purchase has also been
       increased.
    c) Under your O.I. rider, you have the right to increase the amount of
       your Policy Benefit on each option date. Prior to age 46, the
       amount of increase on any option date can be up to 100% of your
       Total Amount of Options. After age 46, the amount of increase on
       any option date can be up to 1/3 of the Total Amount of Options.
       These amounts of increases reflect our new liberalized amounts.
    d) The termination date of your rider has been extended from "the
       anniversary of the Date of Issue next following your 50th birthday"
       to "the anniversary of the Date of Issue next following your 52nd
       birthday." This means you will have two additional years to
       exercise your option amounts. The rider will still continue to
       terminate if you have used up all your option amounts or if your
       policy has terminated.
    e) You can apply for an increase in your Policy Benefit on any option
       date even though you are disabled. Up to $600 of this increase
       will be payable while that period of disability continues. Any
       increase, including the $600, will be subject to our current issue
       and participation limits.
    f) When an increase is exercised, the premium for this rider will be
       reduced. The reduced premium will be based on the Total Amount of
       Options remaining.

1300 South Clinton Street
P.O. Box 1110
Fort Wayne, Indiana 46801



**LINCOLN NATIONAL**
LIFE INSURANCE
COMPANY

3.  The option to Convert Supplemental 60 Benefit Rider is our newest rider and we are excited about it. This rider allows you, on each anniversary of the Date of Issue, to convert your Supplemental 60 Benefit to an Age 65 Benefit Period, without evidence of insurability. This rider is available at a small premium.

We appreciate your business and look forward to serving you. Be sure to attach this letter to your policy. If you would like to add, or increase any of the riders mentioned above, or if you have any questions, please feel free to contact your agent.

Sincerely,


Insurance Operations Department
Individual Products Division